UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

SABINA VARGAS,                           :

                        Plaintiff,       :     04 Civ. 3204 (LAK)(HBP)

     -against-                           :
                                               REPORT AND
MICHAEL J. ASTRUE,                       :     RECOMMENDATION
Commissioner of Social Security,
                                         :

                        Defendant.       :
----------------------------------X

          PITMAN, United States Magistrate Judge:

          TO THE HONORABLE LEWIS A. KAPLAN, United States Dis-

trict Judge,

I.   Introduction

          Plaintiff, Sabina Vargas, brings this action pursuant

to Section 205(g) of the Social Security Act ("SSA"), 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the

Commissioner of Social Security ("Commissioner") denying her

application for Supplemental Security Income ("SSI").   The

Commissioner has moved for judgment on the pleadings pursuant to

Rule 12(c) of the Federal Rules of Civil Procedure (Docket Item

9).   For the reasons set forth below, I respectfully recommend

that this case be remanded to the Commissioner for further

administrative proceedings consistent with this Report and

Recommendation.

II.  Background

   A.  Procedural Background

      Plaintiff filed an application for SSI on July 23, 1984

alleging that she was disabled due to "bronchitis[1] and [tubercu-

losis][2] plus varicose veins[3]" beginning in 1968 (Tr.[4] 76-85).  The

SSA denied plaintiff's application for benefits on September 25,

1984, finding that her condition was not disabling (Tr. 189-91).

Plaintiff's claim was reopened pursuant to the decision in

---

[1]Bronchitis refers to inflammation of a bronchus or bronchi;
there are both acute and chronic varieties.  Symptoms usually
include fever, coughing, and expectoration.  Chronic forms may
involve secondary changes to lung tissue.  Dorland's Illustrated
Medical Dictionary, 256 (31st ed. 2007) ("Dorland's").

[2]Tuberculosis refers to any of the infectious diseases of
humans or other animals caused by species of Myobacterium and
characterized by the formation of tubercles and caseous necrosis
in the tissues.  Tuberculosis varies widely in its manifestations
and has a tendency to great chronicity.  Any organ may be
affected, although in humans the lung is the major seat of the
disease and is the usual portal of entry into the body.  See
Dorland's at 2006.

[3]Varicose veins refer to dilated tortuous veins, usually in
the subcutaneous tissues of the leg, often associated with
incompetency of the venous valves.  See Dorland's at 2065.

[4]"Tr." refers to the administrative record that the
Commissioner filed as part of his answer, as required by 42
U.S.C. § 405(g).

Stieberger v. Sullivan, 801 F. Supp. 1079 (S.D.N.Y. 1992) (Sand,
D.J.), which held that claimants who had a disability claim
denied or terminated at the administrative level between October
1, 1981 and October 17, 1985, or after a decision by an Adminis-
trative Law Judge ("ALJ") or the Appeals Council between October
18, 1985 and July 2, 1992, and who were New York residents at the
time of the denial or termination, would be given the opportunity
to have their claims reopened or re-adjudicated (Memorandum of
Law in Support of the Commissioner's Motion for Judgment on the
Pleadings, dated May 21, 2010 (Docket Item 10), ("Commissioner's
Mem. in Supp.") at 2; Tr. 43).  Accordingly, plaintiff's 1984
application was reviewed, and subsequently denied on November 29,
1999 (Tr. 43-44).

On December 3, 1999, plaintiff requested (Tr. 45-46)
and was granted (Tr. 47-53) a hearing before an ALJ, which took
place on August 3, 2000 (Tr. 21-41).  In a decision dated Decem-
ber 5, 2000, the ALJ found that plaintiff had not been under a
disability within the meaning of the SSA from June 1, 1988
through June 24, 1992[5] ("the Critical Period") (Tr. 10-20).
Plaintiff requested that the Appeals Council review this decision

---

[5]Plaintiff had filed an additional application for SSI
benefits on July 18, 1988, which was denied.  Plaintiff then
filed a third SSI application on June 25, 1992 which was allowed
from the date of her application (Tr. 55-75).

(Tr. 8-9), which the Appeals Council denied on March 19, 2004 (Tr. 4-7).

On April 27, 2004, plaintiff filed a form complaint in the United States District Court in the Southern District of New York (Docket Item 2), claiming that "[t]he decision of the administrative law judge was erroneous, not supported by substantial evidence on the record and/or contrary to the law" (Complaint, dated Apr. 6, 2004 (Docket Item 2), ("Compl.") ¶ 9).  On October 7, 2004, by joint stipulation, the Court remanded the case pursuant to sentence six of 42 U.S.C. § 405(g) (Docket Item 7).  The Appeals Council then vacated the ALJ's decision and remanded the case for further proceedings, directing the ALJ to obtain all medical records from the Critical Period, document attempts made to develop the record, obtain expert testimony if necessary, and apply the standard set forth in 20 C.F.R. § 416.920(c) in addressing the severity of plaintiff's impairments.  The ALJ would also offer the claimant an opportunity for a hearing (Tr. 185-86).

Plaintiff failed to appear for a hearing on July 31, 2006, and the ALJ issued an order dismissing the request for a hearing on August 1, 2006 (Tr. 171).  On February 23, 2007, the Appeals Council vacated the ALJ's dismissal and again remanded

4

the case, noting a judicial remand pursuant to sentence six must be decided on the merits (Tr. 171).

On May 8, 2007, plaintiff appeared at a hearing before ALJ Robin Arzt (Tr. 252-62).  The ALJ concluded that plaintiff was disabled beginning on July 11, 1990 through June 24, 1992, but was not disabled before then (Tr. 168-77).  Plaintiff's daughter requested review of this decision on her mother's behalf on August 2, 2007 (Tr. 162-67).  On May 3, 2008, the Appeals Council found that plaintiff did not file timely objections to the ALJ's decision, therefore it was the final decision of the Commissioner (Tr. 160-61).

The Commissioner now presents this case to the Court for review pursuant to sentence six of 42 U.S.C. § 405(g).  The Commissioner filed an Answer on April 23, 2010 (Docket Item 12) and a Motion for Judgment on the Pleadings on May 21, 2010 (Docket Item 9).  Plaintiff was granted several extensions of time to respond to the Commissioner's motion, the last of which granted her until January 31, 2011 to file her response (Docket Item 16).  Plaintiff has not yet made any responsive submission.

B.  Plaintiff's
    Social Background

Plaintiff was born on July 11, 1935 (Tr. 76).  She primarily speaks Spanish and the highest level of schooling she completed was the fourth or fifth grade (Tr. 29, 90, 97).  Her husband passed away in April 1988 and she has five children (Tr. 56, 78).  Plaintiff reported that she has never worked (Tr. 91).

C.  Plaintiff's
    Medical Background

1.  Information
    Reported by Plaintiff

Plaintiff reported that she has suffered from asthma,[6] bronchitis, shortness of breath, memory loss, heart problems, varicose veins, tuberculosis, diabetes, glaucoma, arthritis and high blood pressure, among other things (Tr. 30-33, 77, 91, 93, 105, 108-09, 116).  She noted that she was unable to "stand a lot" due to her varicose veins, and wore supportive stockings, which did little to improve her symptoms (Tr. 116).

---

[6]Asthma refers to recurrent attacks of paroxysmal dyspnea, with airway inflammation and wheezing due to a spasmodic contraction of the bronchi.  Some cases are allergic manifestations in sensitized persons; others are provoked by factors such as vigorous exercise, irritant particles, psychologic stresses, and others.  See Dorland's at 170.

In 1984, plaintiff reported that she was able to take her children to school and the park, but she became dizzy when using public transportation (Tr. 119).  She also reported that she could cook, clean, shop, do laundry and take her children to school (Tr. 119).

Plaintiff reported in 1988 that she was able to travel by taxi or bus, and could watch television and visit with friends and family often (Tr. 111).  She did "very little cooking" and "some shopping and cleaning" (Tr. 111).  She also indicated that she tired easily, that her feet often swelled, and she was allergic to certain materials (Tr. 108).

In 1992, plaintiff reported that she could not lift her arms in the air and suffered from asthma and memory loss.  She claimed that her relatives assisted her with household chores and she was mainly only able to watch television and walk in the park.  She could visit friends and family when she felt well, but could not take the subway because she could not use the stairs (Tr. 103, 105).

In addition, plaintiff's daughter, Jacqueline Vargas, testified in 2000 that plaintiff suffered from shortness of breath and used an inhaler, which ameliorated her symptoms to a limited extent (Tr. 32).  She also reported that plaintiff had heart problems, for which she received treatment at St. Vincent's

7

Hospital (Tr. 33). She further stated that her mother developed glaucoma[7] in 1990 and was treated with eye drops, which helped to control the pressure "a little" (Tr. 35-36). Plaintiff's daughter also reported that plaintiff was diagnosed with diabetes in 1990 and was treated with medication and a restricted diet (Tr. 36-37). Plaintiff went to St. Vincent's Hospital every two months to have her blood sugar levels checked (Tr. 37). In addition, plaintiff's daughter reported that plaintiff saw a psychiatrist at St. Vincent's Hospital at least once during the Critical Period (Tr. 39).

Plaintiff also testified in 2000 about her physical limitations. Plaintiff did not have any trouble sitting or standing (Tr. 37-38). Between 1988 and 1992, she continued to perform housework, including shopping, cooking, cleaning and laundry, but did not do so "as much" (Tr. 38). Plaintiff was unable to bend, but had not been treated for back problems (Tr. 38-39).

In 2007, plaintiff reported that she suffered from depression, but she could not recall her symptoms during the Critical Period (Tr. 258).

---

[7]Glaucoma refers to a group of eye diseases characterized by an increase in intraocular pressure that causes pathologic changes in the optic disk and typical defects in the field of vision. See Dorland's at 794.

2.   Treatment Records

Plaintiff's attorney attempted to obtain medical records from St. Vincent's Hospital following the August 3, 2000 hearing, but reported on June 20, 2006 that St. Vincent's had no records for plaintiff for the period between 1988 to 1992 (Tr. 25-26, 33-34, 39-40, 245).  The ALJ was also unsuccessful in retrieving medical records after serving a subpoena on St. Vincent's, and attempting to mail subpoenas to Drs. McVeigh and Hobacon, which could not be delivered (Tr. 246-51).

3.   Medications

Plaintiff reported using eye drops (Tr. 154) and taking "Abutural," "Accolate" and "Nezanex" for her asthma (Tr. 157) as well as "Slobid" (Tr. 142), "Proventyl" (Tr. 96, 101, 142) and "Uniphil" (Tr. 96).

4.   Consultative Physicians

a.   Dr. Mario Henriquez

Dr. Henriquez examined plaintiff on August 7, 1984 (Tr. 124).  On that date, plaintiff complained that she suffered from varicose veins and chronic bronchitis with a chronic cough.  She reported a history of tuberculosis eleven years before, which was

9

treated with pills for about one year.  Plaintiff further re-
ported that she smoked more than one package of cigarettes per
day, but did not drink alcohol.  She denied any hemoptysis,[8]
fever or weight loss, but claimed that she had been suffering
from varicose veins for about fourteen years, and that she had so
much pain in her legs that she could not stand for long periods
of time (Tr. 124).

        Plaintiff had no history of abnormalities in her skin,
head, neck, eyes, ears, throat, sinuses, cardiac system, breasts,
gastro-intestinal system, genitourinary system, musculoskeletal
system, and nervous system (Tr. 124-25).  Despite her history of
tuberculosis, examination of her respiratory system revealed no
wheezing, dyspnea,[9] hemoptysis, pneumonia,[10] pleurisy[11] or evidence

---

[8]Hemoptysis refers to the expectoration of blood or of
blood-stained sputum.  See Dorland's at 853.

[9]Dyspnea refers to breathlessness or shortness of breath;
difficult or labored respiration.  See Dorland's at 589.

[10]Pneumonia refers to inflammation of the lungs with
consolidation.  Human pneumonias are most often categorized
according to causative organism or location.  See Dorland's at
1493.

[11]Pleurisy refers to inflammation of the pleura, the serous
membrane investing in the lungs and lining of the thoracic
cavity, with exudation into its cavity and upon its surface;
there are both dry and wet types.  The inflamed surfaces of the
pleura may become permanently united by adhesions.  The symptoms
include localized chest pain and dry cough; as effusion occurs
there is dyspnea but a diminution of the pain.  See Dorland's at
                                        (continued...)

of "occupational exposure" (Tr. 124).  Though she gave a history

of varicose veins, she did not suffer from claudication,[12] phle-

bitis[13] or ulcers[14] (Tr. 125).

      Plaintiff's physical examination revealed that her

blood pressure was 130/86 and her pulse was 96 (Tr. 125).  Dr.

Henriquez concluded that plaintiff looked her normal stated age,

was well-oriented as to time, place and space, was cooperative

and in no apparent distress (Tr. 125).  Dr. Henriquez further

noted that plaintiff walked briskly to the examination table.

Plaintiff's examination did not reveal any abnormalities in her

skin, head, eyes, ears, nose, mouth, teeth, neck, lymph nodes,

breasts, chest, heart, peripheral pulses, abdomen, extremities

(besides varicose veins), and her neurological and musculoskelet-

al systems (Tr. 125-26).  Plaintiff had normal muscle strength, a

straight back, and normal range of motion in all major joints

--------

[11](...continued)
1481-82.

[12]Claudication refers to limping or lameness.  See Dorland's
at 375.

[13]Phlebitis refers to inflammation of a vein.  See Dorland's
at 1453.

[14]Ulcer refers to a local defect, or excavation, of the
surface of an organ or tissue, which is produced by the sloughing
of inflammatory necrotic tissue.  See Dorland's at 2024.

(Tr. 126).   A chest x-ray revealed normal lung expansion without cardiomegaly[15] (Tr. 127).

Dr. Henriquez also ordered a pulmonary function test, which was performed by Arnold Slovi[16] (Tr. 127-31).   The test revealed that plaintiff was not in acute respiratory distress, there was no wheezing present on auscultation[17] of the chest, she had a "good ability" to understand directions for performing the test, and she cooperated well.   Mr. Slovi noted that plaintiff "performed to the best of her ability" and reported that she had had shortness of breath for one year (Tr. 129).

Plaintiff also had a chest x-ray on August 7, 1984 (Tr. 132).   It revealed that her lung fields were clear, and her heart, mediastinum[18] and bony thorax were unremarkable.   Dr. Alan

---

[15]Cardiomegaly refers to abnormal enlargement of the heart from either hypertrophy or dilatation.   See Dorland's at 299.

[16]The form appears to be signed by an individual named Arnold Slovi.   Though he signed on a line pre-marked "M.D.," he also wrote in the letters "LR."   It is unclear what Mr. Slovi's position was (Tr. 129).

[17]Auscultation refers to the act of listening for sounds within the body, chiefly for ascertaining the condition of the lungs, heart, pleura, abdomen and other organs.   See Dorland's at 182.

[18]Mediastinum refers to the mass of tissues and organs separating the two pleural sacs, between the sternum anteriorly and the vertebral column posteriorly, and from the thoracic inlet superiorly to the diaphragm inferiorly.   It contains the heart and pericardium, the bases of the great vessels, the trachea and
(continued...)

Berlly, a radiologist analyzing plaintiff's tests, described it as a normal chest x-ray (Tr. 132).

        b.  Dr. Edmond B. Balinberg

      Dr. Balinberg, another consultative physician, examined plaintiff on August 12, 1988.  Plaintiff complained at that time that she had been suffering from shortness of breath for seven years (Tr. 133).  She also reported that fourteen or fifteen years earlier she had been treated for tuberculosis for one year, but was not hospitalized.  She claimed that she did not smoke, had bronchitis several times in the past, was anemic[19] and had received a blood transfusion thirteen years prior (Tr. 133).

      Plaintiff stated that her daily activities were restricted by her shortness of breath, and she had difficulty climbing stairs.  Her daughter had to do all household chores and shopping (Tr. 133).  Plaintiff also complained that she suffered from varicose veins and swelling in her legs (Tr. 133).  She was

---

   [18](...continued)
bronchi, esophagus, thymus, lymph nodes, thoracic duct, phrenic and vagus nerves, and other structures and tissues.  See Dorland's at 1134.

   [19]Anemia refers to a reduction below normal in the concentration of erythrocytes or hemoglobin in the blood; it occurs when the equilibrium is disturbed between blood loss and blood production.  See Dorland's at 79.

not taking any medication at the time and had not been hospital-
ized or admitted to an emergency room (Tr. 133).

Physical examination revealed "blood pressure in the
right, upper extremity, in a sitting position, 140/85; in the
left upper extremity, in a sitting position, 140/85; in an
upright posture, 145/90" (Tr. 133).  Dr. Balinberg noted that
plaintiff was oriented and cooperative and moderately overweight.
He also noted that her funduscopic[20] examination was unremark-
able, "AV-nicking" was negative and she had no exudates,[21] hemor-
rhages or papilledema.[22]  Dr. Balinberg also observed that plain-
tiff's oral hygiene was good, her oropharynx[23] was normal, her
ears and nose were "[w]ithin normal limits" and the jugular veins
in her neck were not distended when she was in a sitting posi-
tion.  Her thyroid was not enlarged (Tr. 133).

---

[20]Funduscopy refers to ophthalmoscopy, the examination of
the interior eye with the ophthalmoscope.  See Dorland's at 761,
1350.

[21]Exudates refer to material, such as fluid, cells, or
cellular debris, which has escaped from blood vessels and has
been deposited in tissues or on tissue surfaces, usually as a
result of inflammation.  See Dorland's at 673.

[22]Papilledema refers to edema of the optic disk, most
commonly due to increased intracranial pressure, malignant
hypertension, or thrombosis of the central retinal vein.  See
Dorland's at 1393.

[23]Oropharynx refers to the division of the pharynx lying
between the soft palate and the upper edge of the epiglottis.
See Dorland's at 1358, 1409.

Dr. Balinberg found that plaintiff's chest was symmetrical "with a mild reduction in the chest expansion and diaphragmatic motion" (Tr. 134).  The circumference of her chest on "deep inspiration"[24] was 39 3/4 inches, and 39 inches on expiration.[25] Dr. Balinberg also examined plaintiff's lungs and found that percussion was normal, they were clear on auscultation, she had no wheezing and made normal breathing sounds.  She had a forced expiratory time of 4 seconds, a respiration rate, in a sitting position, of 14 per minute, and was in no respiratory distress during the examination.  Palpation[26] of plaintiff's chest revealed "the apical[27] impulse 2 cms. in diameter located in the left fifth intercostal[28] space mid clavicular[29] line" (Tr. 134). She had a regular heart rate of 80 beats per minute on ausculta-

---

[24]Inspiration refers to inhalation.  See Dorland's at 958.

[25]Expiration refers to exhalation.  See Dorland's at 669.

[26]Palpation refers to the act of feeling with the hand; the application of the fingers with light pressure to the surface of the body for the purpose of determining the consistency of the parts beneath in physical diagnosis.  See Dorland's at 1386.

[27]Apical pertains to the apex.  See Dorland's at 117.

[28]Intercostal means situated between the ribs.  See Dorland's at 961.

[29]Clavicular means pertaining to the clavicle, a bone that articulates with the sternum and scapula, forming the anterior portion of the shoulder girdle on either side.  See Dorland's at 376.

tion, and did not have any murmur or gallop.  She also had no premature beats during the three minutes of auscultation (Tr. 134).

An examination of plaintiff's abdomen revealed that her liver and spleen were within normal limits (Tr. 134).  She had normal bowel sounds and did not have bruits[30] in her abdomen nor over the costovertebral[31] angles.  She did not have an external hernia[32] (Tr. 134).

Dr. Balinberg also examined plaintiff's extremities, noting that she had varicose veins in both legs (Tr. 134).  He found that she had a few thin varicose veins below her left knee, especially in the dorsal[33] aspect of her left foot.  In her right leg, she had varicose veins up to the lower third of her thigh, predominant over the anterior aspect of her calf, and in the posterior aspect of her calf around her ankle "predominant internal aspect and dorsal aspect of the foot" (Tr. 134).  Dr.

---

[30]Bruit refers to a sound.  See Dorland's at 260.

[31]Costovertebral pertains to a rib and a vertebra.  See Dorland's at 431.

[32]Hernia refers to the protrusion of a loop or knuckle of an organ or tissue through an abnormal opening.  See Dorland's at 859.

[33]Dorsal pertains to the back or denoting a position more toward the back surface than some other object of reference.  See Dorland's at 570.

Balinberg noted that only the right long saphenous[34] vein was distended with an average diameter of .8 centimeters.  He further noted that palpation over the varicose veins was tender, but he did not feel any distended "vensou cord suggestive of acute phlebitis" (Tr. 134).  Plaintiff had no trophic changes such as eczema,[35] ulceration, pallor, coldness or gangrene,[36] and "Homan's sign"[37] and "Trendelenburg's sign"[38] were negative bilaterally.

---

[34]Saphenous pertains to a vena saphena, or small vein.  See Dorland's at 1692, 2064.

[35]Eczema refers to any of the various pruritic, papulovesicular types of dermatitis occurring as reactions to endogenous or exogenous agents.  See Dorland's at 599.

[36]Gangrene refers to death of tissue, usually in considerable mass and generally associated with loss of vascular (nutritive) supply and followed by bacterial invasion and putrefaction.  See Dorland's at 772.

[37]Homan's Sign refers to pain on passive dorsiflexion of the foot; a sign of thrombosis of deep calf veins.  See Dorland's at 1737.

[38]Trendelenburg's Sign, when used to test the varicosity and condition of heart valves, is implemented when the leg is raised above the level of the heart until the veins are empty, and then quickly lowered.  If the veins become distended at once, varicosity and valve incompetence are indicated.  When used to test gluteus medius function, the patient, standing erect with back to the examiner, lifts first one leg and then the other.  If when weight is supported by an affected limb, the pelvis on the sound side falls instead of rising, this indicates disturbance of the gluteus medius mechanism, such as deformity of the femoral neck, dislocation of the hip joint, or weakness or paralysis of the gluteus medius muscle.  See Dorland's at 1926.

However, plaintiff did have "Grade I pitting edema[39] in the right leg below the knee" (Tr. 134).  At 4+ she had normal peripheral pulses without bruits on auscultation over the femoral[40] arteries.  She had no history suggestive of intermittent claudication (Tr. 134).

Upon examination of her musculoskeletal system, Dr. Balinberg found that plaintiff had normal range of motion in all of her joints, minimal crepitus[41] in both knees, and no effusion[42] (Tr. 134).  Her neurological examination revealed that she was alert, oriented, and cooperative "with good relevance and good grooming" (Tr. 135).  Dr. Balinberg noted that Romberg's sign[43]

---

[39]Edema refers to the presence of abnormally large amounts of fluid in the intercellular tissue spaces of the body, usually referring to subcutaneous tissues. It may be localized or systemic.  Pitting edema refers to edema in which the tissues show prolonged existence of the pits produced by pressure.  See Dorland's at 600.

[40]Femoral pertains to the femur or to the thigh.  See Dorland's at 696.

[41]Bony crepitus refers to the crackling sound produced by the rubbing together of fragments of fractured bone.  Joint crepitus refers to the grating sensation caused by the rubbing together of the dry synovial surfaces of joints.  See Dorland's at 437.

[42]Effusion refers to the escape of fluid into a part or tissue.  See Dorland's at 603.

[43]Romberg's Sign refers to swaying of the body or falling when standing with the feet close together and the eyes closed; the result of loss of joint position sense, seen in tabes
(continued...)

was negative, plaintiff's coordination was normal, and she completed straight leg raises in her right and left legs up to 80 degrees.  He noted that in plantar[44] reflexes, "the response was flexor"[45] and there was no impairment of sensation.  Deep tendon reflexes were 2+ in the upper extremities, and plaintiff exhibited 2+ knee jerks and 2+ Achillian reflexes (Tr. 135).

Dr. Balinberg observed that plaintiff had "fluent speech," was able to understand him when he spoke in a normal tone of voice, and her cranial nerves were within normal limits. She had "good turgor"[46] in her skin and mucous membranes, and no palpable lymph nodes.  An x-ray revealed that plaintiff's lungs were clear and she had minimal cardiac enlargement.  However, Dr. Balinberg noted that her "vents" were "suggestive of restrictive and obstructive reduction of pulmonary function" (Tr. 135).

---

[43](...continued)
dorsalis and other diseases affecting the posterior columns.  See Dorland's at 1739.

[44]Plantar pertains to the sole of the foot.  See Dorland's at 1476.

[45]Flexor means causing flexion, the condition of being bent, or any muscle that flexes a joint.  See Dorland's at 725.

[46]Turgor in the skin is a reflection of the skin's elasticity, measured by monitoring the time it takes for the skin of the forearm to return to position after it is lightly pinched between the examiner's thumb and forefinger.  Normal turgor is a return to normal contour within three seconds; if the skin remained elevated (tented) more than three seconds, turgor is decreased.  See Dorland's at 2019.

Dr. Balinberg diagnosed plaintiff with moderate obesity, a history of pulmonary tuberculosis and respiratory dysfunction, and varicose veins (Tr. 135).  He recommended follow-up "by the treating source suggested" and encouraged her to lose weight (Tr. 135).

c.   Dr. Steven Rocker

Dr. Rocker performed a third consultative examination on plaintiff on December 5, 1992 (Tr. 142-43).  He noted that plaintiff was 57 years old at the time and reported having asthma since 1988, but did not describe wheezing episodes or "convincing asthma attacks" (Tr. 142).  She did have a nonproductive cough, but did not have a history of orthopnea[47] or PND (paroxysmal nocturnal dyspnea)[48] (Tr. 142).

Plaintiff reported experiencing a "suffocating feeling" when she got upset, which usually lasted for about one minute. Plaintiff also claimed that she had a poor memory and had suffered from depression since her husband's death, frequently

---

[47]Orthopnea refers to dyspnea that is relieved by assuming an upright position.  See Dorland's at 1359.

[48]Paroxysmal nocturnal dyspnea refers to episodes of respiratory distress that awaken patients from sleep and are related to posture (especially reclining at night), usually attributed to congestive heart failure with pulmonary edema but sometimes occurring in patients with chronic pulmonary diseases. See Dorland's at 589.

having crying spells.  She denied any history of suicide at-

tempts, suicidal ideation, hallucinations or delusions, and had

not been under any psychiatric treatment.  At the time, she was

taking Slobid and using an inhaler (Tr. 142).

Plaintiff denied cigarette smoking as well as alcohol

and drug abuse (Tr. 142).  She reported that she had never worked

and that she could not take public transportation alone because

she gets lost.  She was living with three of her adult children,

two of whom had a "mental dysfunction" (Tr. 142).  She performed

household chores and watched television, but she could not read

or write.  Dr. Rocker observed that plaintiff was well-developed,

well-nourished, casually dressed, neatly groomed and slightly

overweight.  She was in no acute distress and her affect was

appropriate.  Dr. Rocker noted that she was not short of breath.

Her pulse was 92 and regular, and her blood pressure was 160/90

in her right arm while she was seated.  A physical examination

also revealed the following:

> Resp. 16.  SHEENT:  Normal TNT, conjunctivae[49] pink,
> anicteric.[50]  PERRL.  Fundi benign.  Nasopharynx clear.
> Neck supple, trachea midline, no JVD, no HJR, no

---

[49]Conjunctiva refers to the delicate membrane that lines the
eyelids and covers the exposed surface of the sclera.  See
Dorland's at 412.

[50]Anicteric means not associated with jaundice.  See
Dorland's at 92.

thyromegaly.[51]  Carotids[52] without bruits.  Chest nega-
tive.  Lungs clear to P&A.  No wheezes, rhonchi[53] or
rales.[54]  Heart:  PMI 5th intercosal space, midclavi-
cular line.  Regular rhythm.  S1 and S2 normal.  No
murmurs, no gallops.[55]  Abdomen - Soft, nontender, no
masses, no organomegaly.[56]

(Tr. 142-43).  Dr. Rocker also examined plaintiff's extremities.

He found no clubbing[57], cyanosis[58] or edema, and her peripheral

pulses were intact (Tr. 143).  Her station and gait were normal,

and she had no difficulty getting up from a seated position or

---

[51]Thyromegaly refers to a goiter.  See Dorland's at 1952.

[52]Carotid pertains to the principal artery of the neck.  See
Dorland's at 302.

[53]Rhonchus refers to a continuous sound consisting of a dry,
low-pitched, snore-like noise, produced in the throat or
bronchial tube due to a partial obstruction such as by
secretions.  See Dorland's at 1667.

[54]Rale is a discontinuous sound consisting of a series of
short nonmusical noises, heard primarily during inhalation;
called also a crackle.  See Dorland's at 1600.

[55]Gallop refers to a disordered rhythm of the heart.  See
Dorland's at 767.

[56]Organomegaly refers to enlargement of an internal organ or
organs.  See Dorland's at 1355.

[57]Clubbing refers to a digital deformity produced by
proliferation of the soft tissues about the terminal phalanges of
the fingers or toes, with no constant osseous changes; seen in
various types of chronic disease of the thoracic organs.  See
Dorland's at 381.

[58]Cyanosis refers to a bluish discoloration, especially of
the skin and mucous membranes, due to excessive concentration of
deoxyhemoglobin in the blood.  See Dorland's at 460.

getting on and off the examination table.  She had full use of her hands in dressing and undressing, and full range of motion in all of her joints.  She did not have any deformities, swelling, warmth or tenderness (Tr. 143).

When Dr. Rocker conducted a neurological exam, he observed that plaintiff stated the date as December 7, 1993 and she could not name the current president (Tr. 143).  Her cranial nerves were intact and her motor, sensory and deep tendon reflexes were all normal.  Her cerebellar function was also intact, and her lymph nodes were not enlarged (Tr. 143).

Laboratory tests of plaintiff's pulmonary function revealed that "[t]here [was] some variation in effort" and there appeared to be "at least one effort in each of the prebronchodilator[59] and postbronchodilator," which Dr. Rocker noted was "good" (Tr. 143).  He concluded that these results indicated a "mild restrictive deficit and possible obstructive deficit, with slight response to bronchodilators" (Tr. 143).  He noted that "[t]his ostensible response may be more a variation in effort" (Tr. 143).

---

[59]Bronchodilator refers to dilating or expanding the lumina of air passages of the lungs or an agent that causes expansion of the lumina of the air passages of the lungs.  See Dorland's at 256.

Dr. Rocker concluded that plaintiff had a history of depression, for which he referred her to a psychiatrist, as well as subjective dyspnea and a history of "possible asthma[,]" but this was not a limiting problem (Tr. 143). He noted that she had the ability to do work-related activities and there was no "convincing physical impairment" (Tr. 143). He recommended that she follow-up with her treating physician (Tr. 143).

### d. Dr. R. King

Plaintiff had a consultative examination with Dr. King, a psychiatrist with Health Disability Consulting Services, Inc., on December 5, 1992 (Tr. 151). Dr. King noted plaintiff's statement that she came to the appointment by bus with her daughter because she gets lost. Plaintiff reported that she had no history of psychiatric hospitalizations or consultations, but stated that she had been depressed since her husband passed away suddenly in 1988. She claimed that after his death she periodically heard her husband speaking to her and stated "'Sometimes I feel him behind me, I get cold,'" which frightened her (Tr. 151). She also reported feelings of depression, crying spells and difficulty sleeping. She had no history of suicidal behavior, delusional thinking, alcohol or drug abuse, arrests or significant relationships with the opposite sex. She was not taking any

24

psychotropic[60] medication and denied any previous psychiatric
difficulties (Tr. 151).

      Dr. King found that plaintiff was not in any acute
distress, that she had a fair rapport, was cooperative and was
dressed and groomed nicely (Tr. 151).  Her speech was coherent
and relevant and she did not display any thought disorder.  Her
affect was friendly but depressed, and she was grieving the death
of her husband.  Dr. King did not think that plaintiff was a
suicide risk and she did not display "ideas of reference or
paranoid trends" (Tr. 151).  Dr. King found that plaintiff's
intellectual functioning was in the average range, though some-
what disorganized, requiring structure from the interviewer.
There was no evidence of "organicity" and her insight and judg-
ment were fair.  Her "sensorium"[61] was clear and she was oriented
to time, place, and person (Tr. 151).

      Dr. King also noted that plaintiff lived with three of
her five children, ages 16 through 23.  She had been married for
twenty-five years before her husband passed away.  She could
perform "routine activities of living and household chores,

---

    [60]Psychotropic means exerting an effect upon the mind;
capable of modifying mental activity.  See Dorland's at 1573.

    [61]Sensorium refers to any of the primary receptive areas or
the condition of a subject relative to the subject's
consciousness or mental clarity.  See Dorland's at 1718.

including shopping" (Tr. 152) and she went to church every Sunday with her daughter (Tr. 151).  Plaintiff reported that she could complete simple errands such as shopping, but preferred to do so with a companion because she would "forget things" (Tr. 151). She reported having a fourth grade education and stated that she worked for a few years doing housework, but had not done so in over thirty years (Tr. 151).  She further reported watching television and noted that she had adequate concentration, but claimed that she had no close friends.  She did not have any plans or goals for the future (Tr. 152).

Dr. King concluded that plaintiff "had a satisfactory ability to understand, carry out, and remember instructions, and a fair ability to respond appropriately to supervision, co-workers, and work pressures in a work setting" (Tr. 152).  Dr. King diagnosed plaintiff with a grief disorder, which was indi-cated at a mild to moderate degree.  She noted that plaintiff might benefit from psychiatric counseling and that her prognosis was fair.  She believed that plaintiff could manage her own funds (Tr. 152).

D.  Proceedings Before
    the ALJ

1. Plaintiff's 2000 Hearing

Plaintiff had her first hearing on August 3, 2000 (Tr. 21-41).  She was represented by counsel and both she and her daughter, Jacqueline Vargas, testified, plaintiff with the aid of a Spanish interpreter (Tr. 23).  The ALJ noted that he had granted plaintiff's counsel's request to keep the record open so that counsel could gather additional medical documentation (Tr. 25).

Plaintiff confirmed that she was 65 years old at the time of the hearing, and was born on July 11, 1935 (Tr. 27).  She further confirmed that she claimed to be disabled from June 1988 to June 1992 (Tr. 27).  She testified that she was widowed and had five adult children, whom she lived with on the third floor of a building with an elevator (Tr. 28-29).  She traveled to the hearing with her daughter on the subway (Tr. 28-29).  Plaintiff testified that she understood English, but did not speak it, and could not read an English newspaper, though she could read a Spanish one (Tr. 29).  Plaintiff attended formal schooling until the fourth grade and never received any vocational training (Tr. 29).  She testified that she never worked (Tr. 30).

Plaintiff then testified about her medical problems during the Critical Period.  She claimed that she had asthma and high blood pressure, and in 1990 she developed glaucoma and diabetes (Tr. 30).  However, she also testified that she did not remember what was medically wrong with her during the Critical Period specifically, but she went to St. Vincent's Hospital for medical care (Tr. 30).

The ALJ then asked plaintiff's daughter to testify (Tr. 31).  Jacqueline Vargas testified that she was living with her mother during the Critical Period and recalled that plaintiff was "having problems with her heart" and shortness of breath (Tr. 31-32).  Jacqueline Vargas also testified that plaintiff had been seeing Dr. Lee before her practice closed in October 1988, and the went to St. Vincent's (Tr. 34).  She also stated that plaintiff's asthma began in 1988 and that she was given an inhaler, which was helpful "to an extent" (Tr. 32).  She noted that plaintiff was never hospitalized overnight, but she went to St. Vincent's for its asthma clinic and for regular check-ups (Tr.

32-33).  Plaintiff never had an angiogram[62] or angioplastic[63]
procedure (Tr. 34).  Plaintiff's daughter claimed the doctors at
St. Vincent's were "constantly checking on her [mother]" and gave
her "medication for her blood pressure, for the heart" (Tr. 33).
She recalled that the medications eased plaintiff's symptoms "[a]
little," but that "most of the problems were emotional" (Tr. 33).
She testified that Dr. Zolar, a medical doctor, referred plain-
tiff to a psychiatrist, whom she saw at St. Vincent's at least
once, but she could not remember the psychiatrist's name (Tr.
39).

Jacqueline Vargas further testified that her mother
began suffering from glaucoma in 1990 and was given eye drops by
Dr. McVeigh, a doctor affiliated with St. Vincent's Hospital (Tr.
35-36).  The eye drops controlled the pressure in plaintiff's
eyes "a little" (Tr. 36).  Plaintiff did not use glasses and had
not had laser surgery (Tr. 36).  Jacqueline Vargas also testified
that her mother was diagnosed as having diabetes in 1990 (Tr.

_____

[62]Angiogram refers to a radiograph of blood vessels taken
during angiography, the radiographic visualization of blood
vessels following introduction of contrast material; used as a
diagnostic aid in such conditions as stroke syndrome and
myocardial infarction.  See Dorland's at 85.

[63]Angioplasty refers to an angiographic procedure for
elimination of areas of narrowing in blood vessels.  See
Dorland's at 87.

36).  She was given pills and a restricted diet and she had blood tests every month or so (Tr. 37).

Finally, plaintiff testified that she did not have any trouble sitting or standing during the Critical Period (Tr. 38). She had continued to do housework, including cooking, cleaning and shopping after 1988, but did so to a lesser degree because she had trouble catching her breath (Tr. 38).  Plaintiff also noted that she could not bend during the Critical Period, but she had not received any treatment for her back (Tr. 38-39).

### 2. Plaintiff's 2007 Hearing

Plaintiff's second and final hearing took place on May 8, 2007 (Tr. 252-62).  Plaintiff was unrepresented and testified with the aid of a Spanish interpreter (Tr. 254).  After the ALJ explained the hearing and appeals process, plaintiff confirmed that she wanted to continue with the hearing despite her not having representation (Tr. 255).  The ALJ then confirmed that plaintiff was currently receiving SSI benefits related to her husband's death, and that the present hearing concerned an application for benefits for the period from June 1, 1988 to June 24, 1992 (Tr. 255).  The ALJ stated that St. Vincent's did not have any records for plaintiff from the Critical Period, and a subpoena to Dr. Anne Marie McVeigh came back as undeliverable,

while the address for Dr. Hobacon was not valid.  The ALJ there-
fore only relied on the consultative examination records (Tr.
257).

Plaintiff confirmed her date of birth as July 11, 1935
and testified that she was born in Guayaquil, Ecuador and had
moved to the United States approximately forty years before the
hearing (Tr. 257).  She spoke "[a] little bit" of English and
could read and write "a little" in Spanish, but she could not
read and write at all in English because she "for[got] things a
lot because of the depression" (Tr. 257-58).  She stated that the
highest level she reached in school was the fourth or fifth grade
while she was in Ecuador.  She testified that she had never
worked (Tr. 258).

Plaintiff further testified that she could not remember
which physical problems she had during the Critical Period
because she was sick (Tr. 258).  The ALJ then explained that
there are regulations which mandate that when a person is at
least 55 years of age, has only a limited education, does not
have a past relevant work history and has a severe impairment,
that person can be considered disabled (Tr. 259).  The ALJ noted
that plaintiff turned 55 in July 1990, and a consultative report
in August 1988 stated that plaintiff had restrictive and obstruc-
tive lung function and varicose veins (Tr. 259).  The ALJ also

31

noted another consultative report from shortly after the close of the Critical Period which concluded that plaintiff had "some restrictive and possibly obstructive lung deficit," though the report did not note that she had varicose veins.  Plaintiff testified that she had not had surgery to eliminate the varicose veins (Tr. 259).

The ALJ stated that the consultative examination reports showed that plaintiff had a lung deficit which existed at the beginning and end of the Critical Period.  The ALJ believed that the lung deficit would prevent plaintiff from performing "heavy work," which indicated that plaintiff had a severe impairment.  However, the ALJ noted that, based on SSA regulations, this impairment could only be considered a disability since July 11, 1990 when plaintiff turned 55 (Tr. 259-60).  The ALJ further stated that if plaintiff was limited to medium work only, she would not be considered disabled, and asked if plaintiff wanted to limit her claim for benefits to the period from July 11, 1990[64] through June 24, 1992 (Tr. 260).  Plaintiff answered that she did not know if she wanted the ALJ to amend the onset date, and the ALJ stated that she could not take any additional evi-

---

[64]The transcript of the hearing reads "July 11 of 2000" but I assume the ALJ intended to say 1990 because shortly thereafter she stated "I can grant the case from her period -- from '90 to '92 based on the CE reports" (Tr. 260-61).

dence from plaintiff because plaintiff could not recall her
condition during the Critical Period.  The ALJ, therefore, closed
the record (Tr. 261).

III.  <u>Analysis</u>

    A.  Applicable Legal
        <u>Principles</u>

        1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the
Commissioner only if it is not supported by substantial evidence
or if it is based upon an erroneous legal standard.  42 U.S.C.
§ 405(g); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127-28 (2d Cir. 2008);
<u>Veino v. Barnhart</u>, 312 F.3d 578, 586 (2d Cir. 2002); <u>Shaw v.
Chater</u>, 221 F.3d 126, 131 (2d Cir. 2000); <u>Tejada v. Apfel</u>, 167
F.3d 770, 773 (2d Cir. 1999); <u>Bubnis v. Apfel</u>, 150 F.3d 177, 181
(2d Cir. 1998).  The Court first reviews the Commissioner's
decision for compliance with the correct legal standards; only
then does it determine whether the Commissioner's conclusions
were supported by substantial evidence.  <u>Tejada v. Apfel</u>, <u>supra</u>,
167 F.3d at 773; <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir.
1987); <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 327-28 (S.D.N.Y.
2009) (Marrero, D.J.); <u>Santiago v. Barnhart</u>, 441 F. Supp. 2d 620,

625 (S.D.N.Y. 2006) (Marrero, D.J.).  "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision." Ellington v. Astrue, supra, 641 F. Supp. 2d at 328; accord Johnson v. Bowen, supra, 817 F.2d at 986 ("Where there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles.").  However, "where application of the correct legal principles to the record could lead to only one conclusion, there is no need to require agency reconsideration." Johnson v. Bowen, supra, 817 F.2d at 986.

　　　2.  Determination of
　　　　　Disability

　　　Under Title II of the Social Security Act, 42 U.S.C. §§ 401 et seq., a claimant is entitled to disability benefits if he or she can establish an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12

34

months."  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); see also

Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment

and inability to work must last twelve months).  The impairment

must be demonstrated by "medically acceptable clinical and

laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it

must be

> of such severity that [the claimant] is not only unable
> to do his previous work but cannot, considering [the
> claimant's] age, education, and work experience, engage
> in any other kind of substantial gainful work which
> exists in the national economy, regardless of whether
> such work exists in the immediate area in which [the
> claimant] lives, or whether a specific job vacancy
> exists for [the claimant], or whether [the claimant]
> would be hired if [the claimant] applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner must consider both objective and

subjective factors when assessing a disability claim, including:

(1) objective medical facts and clinical findings; (2) diagnoses

and medical opinions of examining physicians; (3) subjective

evidence of pain and disability to which the claimant and family

or others testify; and (4) the claimant's educational background,

age and work experience.  Brown v. Apfel, 174 F.3d 59, 62 (2d

Cir. 1999); Rivera v. Schweiker, 717 F.2d 719, 723 (2d Cir.

1983).

"In evaluating disability claims, the [Commissioner] is

required to use a five-step sequence, promulgated in 20 C.F.R.

§§ 404.1520, 416.920."  Bush v. Shalala, 94 F.3d 40, 44 (2d Cir.

1996).

> First, the Commissioner considers whether the claimant
> is currently engaged in substantial gainful activity.
> Where . . . the claimant is not so engaged, the Commis-
> sioner next considers whether the claimant has a "se-
> vere impairment" that significantly limits his physical
> or mental ability to do basic work activities . . . .
> Where the claimant does suffer a severe impairment, the
> third inquiry is whether, based solely on medical
> evidence, he has an impairment listed in Appendix 1 of
> the regulations or equal to an impairment listed there
> . . . .  If a claimant has a listed impairment, the
> Commissioner considers him disabled.  Where a claimant
> does not have a listed impairment, the fourth inquiry
> is whether, despite his severe impairment, the claimant
> has the residual functional capacity to perform his
> past work . . . .  Finally, where the claimant is
> unable to perform his past work, the Commissioner then
> determines whether there is other work which the claim-
> ant could perform.

Balsamo v. Chater, 142 F.3d 75, 79-80 (2d Cir. 1998); see also

Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003); Butts v. Barnhart,

388 F.3d 377, 383 (2d Cir. 2004), amended on other grounds on

rehearing, 416 F.3d 101 (2d Cir. 2005); Green-Younger v.

Barnhart, 335 F.3d 99, 106 (2d Cir. 2003); Shaw v. Chater, supra,

221 F.3d at 132; Brown v. Apfel, supra, 174 F.3d at 62; Tejada v.

Apfel, supra, 167 F.3d at 774; Rivera v. Schweiker, supra, 717

F.2d at 722.

Step four requires that the ALJ make a determination as

to the claimant's residual functional capacity ("RFC").  See

Sobolewski v. Apfel, 985 F. Supp. 300, 309 (E.D.N.Y. 1997).  RFC

is defined in the applicable regulations as "the most [the claimant] can still do despite [his] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  To determine RFC, the ALJ makes a "function by function assessment of the claim-ant's ability to sit, stand, walk, lift, carry, push, pull, reach, handle, stoop, or crouch."  Sobolewski v. Apfel, supra, 985 F. Supp. at 309.  The results of this assessment determine the claimant's ability to perform the exertional demands of sustained work, and may be categorized as sedentary,[65] light,[66] medium, heavy or very heavy.  20 C.F.R. §§ 404.1567, 416.967; see Rodriguez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL 150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).

The claimant bears the initial burden of proving disability with respect to the first four steps.  Burgess v. Astrue, supra, 537 F.3d at 128; Green-Younger v. Barnhart, supra,

---

[65]Sedentary work generally involves up to two hours of standing or walking and six hours of sitting in an eight-hour workday.  SSR 96-9p, 1996 WL 374185 at *3 (1996); see 20 C.F.R. §§ 404.1567(a), 416.967(a).  Sedentary work also involves "lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 C.F.R. §§ 404.1567(a), 416.967(a).

[66]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten pounds."  20 C.F.R. § 404.1567(b).  Light work often "requires a good deal of walking or standing" or "sitting most of the time with some pushing and pulling of arm or leg controls." 20 C.F.R. § 404.1567(b).

335 F.3d at 106; Balsamo v. Chater, supra, 142 F.3d at 80.  Once
the claimant has satisfied this burden, the burden shifts to the
Commissioner to prove the final step -- that the claimant's RFC
allows the claimant to perform some work other than the claim-
ant's past work.  Balsamo v. Chater, supra, 142 F.3d at 80; Bapp
v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986).

> In meeting [his] burden of proof on the fifth step
> of the sequential evaluation process described above,
> the Commissioner, under appropriate circumstances, may
> rely on the medical-vocational guidelines contained in
> 20 C.F.R. Part 404, Subpart P, App. 2, commonly re-
> ferred to as "the Grid."  The Grid takes into account
> the claimant's RFC in conjunction with the claimant's
> age, education and work experience.  Based on these
> factors, the Grid indicates whether the claimant can
> engage in any other substantial gainful work which
> exists in the national economy.

Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995) (Koeltl,
D.J.).  When a claimant retains the RFC to perform at least one
of the categories of work listed on the Grid, and when the
claimant's educational background and other characteristics are
also captured by the Grid, the ALJ may rely exclusively on the
Grid in order to determine whether the claimant retains the RFC
to perform some work other than his or her past work.  Butts v.
Barnhart, supra, 388 F.3d at 383 ("In the ordinary case, the
Commissioner meets his burden at the fifth step by resorting to
the applicable medical vocational guidelines (the [Grid]).")
(internal quotation and citation omitted).

However, "exclusive reliance on the [Grid] is inappro-
priate" where non-exertional limitations "limit the range of
sedentary work that the claimant can perform." Butts v.
Barnhart, supra, 388 F.3d at 383, quoting Rosa v. Callahan, 168
F.3d 72, 78 (2d Cir. 1999) (internal quotation omitted); Bapp v.
Bowen, supra, 802 F.2d at 603.  When a claimant suffers from a
non-exertional limitation such that she is "unable to perform the
full range of employment indicated by the [Grid]," Bapp v. Bowen,
supra, 802 F.2d at 603, or the Grid fails "to describe the full
extent of [the] claimant's physical limitations," the Commis-
sioner must introduce the testimony of a vocational expert in
order to prove "that jobs exist in the economy which the claimant
can obtain and perform."  Butts v. Barnhart, supra, 388 F.3d at
383-84; see 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.-
00(e); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983)
("If an individual's capabilities are not described accurately by
a rule, the regulations make clear that the individual's particu-
lar limitations must be considered.").

### 3.   Treating Physician Rule

When considering the evidence in the record, the ALJ is
required to give deference to the opinions of a claimant's
treating physicians.  Under the regulations' "treating physician

rule," a treating physician's opinion will be given controlling
weight if it is "well-supported by medically acceptable clinical
and laboratory diagnostic techniques and is not inconsistent with
the other substantial evidence in . . . [the] record."  20 C.F.R.
§ 404.1527(d)(2); Shaw v. Chater, supra, 221 F.3d at 134; Diaz v.
Shalala, 59 F.3d 307, 313 n.6 (2d Cir. 1995); Schisler v.
Sullivan, 3 F.3d 563, 567 (2d Cir. 1993).  Before giving a
treating physician's opinion less than controlling weight, the
ALJ must apply various factors to determine the amount of weight
the opinion should be given.  These factors include:  (1) the
length of the treatment relationship and the frequency of exami-
nation; (2) the nature and extent of the treatment relationship;
(3) the medical support for the treating physician's opinion; (4)
the consistency of the opinion with the record as a whole; (5)
the physician's level of specialization in the area and (6) other
factors that tend to support or contradict the opinion.  20
C.F.R. § 404.1527(d)(2)-(6); Schisler v. Sullivan, supra, 3 F.3d
at 567; Mitchell v. Astrue, 07 Civ. 285 (JSR), 2009 WL 3096717 at
*16 (S.D.N.Y. Sept. 28, 2009) (Rakoff, D.J.) (adopting Report and
Recommendation of Freeman, M.J.); Matovic v. Chater, 94 Civ. 2296
(LMM), 1996 WL 11791 at *4 (S.D.N.Y. Jan 12. 1996) (McKenna,
D.J.).  "[G]ood reasons" must be given for declining to afford a
treating physician's opinion controlling weight.  20 C.F.R.

§ 404.1527(d)(2); Schisler v. Sullivan, supra, 3 F.3d at 568;

Burris v. Chater, 94 Civ. 8049 (SHS), 1996 WL 148345 at *6 n.3

(S.D.N.Y. Apr. 2, 1996) (Stein, D.J.).

        4.  Development of
            the Record


        "It is the rule in the [Second C]ircuit that 'the ALJ,

unlike a judge in a trial, must [him]self affirmatively develop

the record' in light of 'the essentially non-adversarial nature

of a benefits proceeding.'" Pratts v. Chater, 94 F.3d 34, 37 (2d

Cir. 1996), quoting Echevarria v. Sec'y of Health & Human Servs.,

685 F.2d 751, 755 (2d Cir. 1982).

            Because a hearing on disability benefits is a non-
            adversarial proceeding, the ALJ generally has an affir-
            mative obligation to develop the administrative record.
            Echevarria v. Secretary of Health & Human Servs., 685
            F.2d 751, 755 (2d Cir. 1982).  This duty exists even
            when the claimant is represented by counsel . . . .
            The [Commissioner's] regulations describe this duty by
            stating that, "[b]efore we make a determination that
            you are not disabled, we will develop your complete
            medical history . . . [and] will make every reasonable
            effort to help you get medical reports from your own
            medical sources when you give us permission to request
            the reports." 20 C.F.R. § 404.1512(d).

Perez v. Chater, 77 F.3d 41, 47 (2d Cir. 1996); see Halloran v.

Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) ("We have stated many

times that the ALJ generally has an affirmative obligation to

develop the administrative record . . . .") (internal quotations

and citation omitted); Shaw v. Chater, supra, 221 F.3d at 131
("The ALJ has an obligation to develop the record in light of the
non-adversarial nature of the benefits proceedings, regardless of
whether the claimant is represented by counsel."); Tejada v.
Apfel, supra, 167 F.3d at 774 (same); Van Dien v. Barnhart, 04
Civ. 7259 (PKC), 2006 WL 785281 at *14 (S.D.N.Y. Mar. 24, 2006)
(Castel, D.J.) (same); Molina v. Barnhart, 04 Civ. 3201 (GEL),
2005 WL 2035959 at *6 (S.D.N.Y. Aug. 17, 2005) (Lynch, D.J.)
(same).  The regulations state that "[w]hen the evidence we
receive from your treating physician . . . or other medical
source is inadequate for us to determine whether you are dis-
abled, . . . [w]e will first recontact your treating physician
. . . or other medical source to determine whether the additional
information we need is readily available."  20 C.F.R. § 404.1512-
(e)(1); see also Perez v. Chater, supra, 77 F.3d at 47.  Where
the ALJ has failed to develop the record adequately, remand to
the Commissioner for further development is appropriate.  See
Pratts v. Chater, supra, 94 F.3d at 39.

   B.   The ALJ's Decision

        After reviewing the procedural history of the case, the
ALJ noted that the Critical Period under review extended from
June 1, 1988 through June 24, 1992 (Tr. 171, 173).  The ALJ then

explained and applied the five-step analysis described in Section
III.A.2. and determined, based on medical evidence and plain-
tiff's testimony, that:  (1) plaintiff had not engaged in sub-
stantial gainful activity during the Critical Period, (2) plain-
tiff had a combination of severe impairments, namely restrictive
and obstructive lung disease and varicose veins, during the
Critical Period, and (3) these impairments, did not, either
singly or in combination, meet or medically equal one of the
listed impairments in 20 C.F.R. Part 405, Subpart P, Appendix 1
(Tr. 172-73, <u>citing</u> 20 C.F.R. § 416.920).

    At step four, the ALJ found that plaintiff had the RFC
to occasionally lift and carry no more than fifty pounds at a
time, frequently lift and carry no more than twenty-five pounds
at a time, walk and stand no more than six hours in an eight hour
day, and frequently stoop and crouch so long as she was in an
environment with reasonably clean air and moderate temperature
and humidity (Tr. 173-74).

    The ALJ noted that in making this finding she "consid-
ered all symptoms and the extent to which these symptoms reason-
ably can be accepted as consistent with the objective medical
evidence and other evidence, based on the requirements of 20 CFR
§ 416.929 and SSRs 96-4p and 96-7p" (Tr. 174).  She also consid-

ered opinion evidence as required by 20 C.F.R. § 416.927 and SSRs
96-2p, 96-5p, 96-6p and 06-3p (Tr. 174).

The ALJ then analyzed plaintiff's symptoms in accor-
dance with a two-step process which requires her to first deter-
mine whether there existed an underlying medically determinable
physical or mental impairment, which can be shown by medically
acceptable clinical and laboratory diagnostic techniques, that
could reasonably be expected to produce plaintiff's pain or other
symptoms (Tr. 174).  The ALJ noted that if she found that such an
impairment existed, the ALJ then had to evaluate "the intensity,
persistence, and limiting effects of [plaintiff's] symptoms to
determine the extent to which they limit [plaintiff's] ability to
do basic work activities" (Tr. 174).  See SSR 96-7p.  When
statements about plaintiff's symptoms are not substantiated by
objective medical evidence, the ALJ noted that she is required to
make a finding on the credibility of the statements.  In doing
so, the ALJ can consider:  (1) plaintiff's daily activities, (2)
the location, duration, frequency, and intensity of plaintiff's
pain or other symptoms, (3) factors that precipitate and aggra-
vate the symptoms, (4) the type, dosage, effectiveness, and side
effects of any medication plaintiff takes or has taken to allevi-
ate pain or other symptoms, (5) treatment, other than medication,
plaintiff receives or has received for relief of pain or other

44

symptoms, (6) any measures other than treatment plaintiff uses or has used to relieve pain or other symptoms, and (7) any other factors concerning plaintiff's functional limitations and re- strictions due to pain or other symptoms (Tr. 174-75, <u>citing</u> SSR 96-7p).

In completing this analysis, the ALJ noted plaintiff's testimony that she could not remember the impairments and limita- tions she suffered during the Critical Period (Tr. 175).  The ALJ therefore relied on plaintiff's previous disability reports to assess her subjective complaints.  The ALJ noted that the July 23, 1984 disability report stated that plaintiff suffered from varicose veins for which she wore support hose, though they did not alleviate her symptoms.  She also noted that plaintiff had tuberculosis and bronchitis at that time, and she was given two medications to treat the tuberculosis for one year.  She noted that plaintiff was able to cook, clean, do laundry and care for her children at that time as well (Tr. 175).

The ALJ also relied on plaintiff's disability report from July 18, 1988, which stated that she suffered from asthma, bronchitis, shortness of breath and varicose veins (Tr. 175). The report also indicated that plaintiff's feet swelled and she tired easily.  The ALJ noted plaintiff's statement that she did some shopping and cleaning, but very little cooking.  She also

noted that plaintiff often visited relatives and friends, and traveled mostly by taxi or bus (Tr. 175).

The ALJ found that plaintiff's medically determinable impairments reasonably could be expected to produce some of her alleged symptoms and limitations, but plaintiff's statements concerning the intensity, persistence and limiting effects of those symptoms were not entirely supported by the record with respect to the period before July 11, 1990.

The ALJ then noted that she was unable to obtain medical records from St. Vincent's, Dr. McVeigh and Dr. Hobacon, therefore she relied on the consulting internists' reports for objective medical evidence concerning plaintiff's condition during the Critical Period (Tr. 175). Specifically, the ALJ took note that the August 12, 1988 report included an abnormal lung function test showing "restrictive and obstructive lung disease" (Tr. 175). She also noted that plaintiff's physical exam revealed "a mild reduction in chest expansion and diaphragmatic motion" as well as "varicose veins in both legs with a distended right long saphenous vein, grade I pitting edema in the lower right leg, and minimal crepitus in her knees" (Tr. 175). The ALJ pointed out that the consulting doctor diagnosed plaintiff with respiratory dysfunction and varicose veins. The ALJ further stated that no RFC assessment was provided (Tr. 175).

46

In addition, the ALJ relied on a consultative examination report from December 5, 1992 (Tr. 175). She noted that this report also included an abnormal lung function test which showed "mild restrictive and possible obstructive lung disease" (Tr. 175). The ALJ stated that the physical exam was clinically normal and the physician diagnosed plaintiff with "possible asthma" and concluded that she had no significant physical impairment (Tr. 175). The ALJ concluded from these reports that plaintiff had a lung impairment which existed at the beginning and end of the Critical Period (Tr. 175).

The ALJ gave significant weight to the clinical and test findings of the consultant physicians because they were not controverted by the record (Tr. 176). However, she gave little weight the portion of the 1992 consultant physician's assessment which found that plaintiff was not limited by her lung impairment because plaintiff had already been found to be disabled several months before that report was completed (Tr. 176).

At step five, the ALJ noted that in determining whether plaintiff could make a successful adjustment to other work, she had to consider plaintiff's age, RFC, education and past relevant work experience in conjunction with the Medical-Vocational Guidelines (Tr. 176, citing 20 C.F.R. Part 404, Subpart P, Appendix 2; SSRs 83-11, 83-12, 83-14, 85-15). Based on the

47

record, the ALJ concluded that plaintiff had no past relevant work experience, she was 52 years old on the first date of the Stieberger period, which the regulations consider "an individual closely approaching advanced age," and she became "an individual of advanced age" on July 11, 1990 (Tr. 176).  The ALJ found that plaintiff received a marginal education in Ecuador, could not communicate in English and was not literate in English.  She could speak and was literate in Spanish.  The ALJ noted that she did not have to analyze transferability of job skills because plaintiff had no past relevant work experience (Tr. 176, citing 20 C.F.R. §§ 416.965, 416.963, 416.964, 416.968).  Based on this evidence, the ALJ concluded that

> Prior to July 11, 1990, the date [plaintiff's] age category changed, considering [plaintiff's] age, education, lack of past relevant work experience, and [RFC], there were a significant number of jobs in the national economy that [plaintiff] could have performed based upon Medical-Vocational Guidelines Rule 203.18, which is used as a framework for decision making.  20 CFR §§ 416.960(c) and 416.966.  [Plaintiff's] additional environmental limitations had little or no effect on [plaintiff's] occupational base of unskilled medium jobs.  SSR 96-9p

(Tr. 176).  After setting forth the legal requirements governing a determination of whether an individual is disabled, the ALJ concluded that prior to the date plaintiff's age category changed, "if [plaintiff] had the [RFC] to perform the full range of medium work, considering [plaintiff's] age, education, and past

relevant work experience, a finding that [plaintiff] is 'not
disabled' would be directed by Medical-Vocational Rule 203.18."
(Tr. 176).  The ALJ noted that plaintiff's additional environmen-
tal limitations would have little or no effect on her occupa-
tional base of unskilled, medium jobs (Tr. 176-77, <u>citing</u> SSR 96-
9p).  Accordingly, the ALJ found that plaintiff was not disabled
at that point.

> However, the ALJ also found that
>
> Beginning on July 11, 1990, the date [plaintiff's] age
> category changed, through June 24, 1992, the end of the
> Stieberger period, considering [plaintiff's] age,
> education, lack of past relevant work experience, and
> [RFC], there are not a significant number of jobs in
> the national economy that [plaintiff] could perform
> based upon Medical-Vocational Guidelines Rule 203.10,
> which is used as a framework for decision making.  20
> CFR §§ 416.960(c) and 416.966.  [Plaintiff's] addi-
> tional environmental limitations had little or no
> effect on [plaintiff's] occupational base of unskilled
> medium jobs.  SSR 96-9p

(Tr. 177).  The ALJ concluded that the Medical-Vocational Guide-
line 203.10 indicates that when plaintiff's age category changed,
plaintiff became disabled.  In summary, the ALJ concluded that
plaintiff was not disabled prior to July 11, 1990, but became
disabled on that date and continued to be so through June 24,

1992, the end of the Stieberger period (Tr. 177, citing 20 C.F.R.
§ 416.920(g)).[67]

    C.  Analysis of the
       ALJ's Decision

    1.  Legal Error

      As noted above, the first inquiry in a district court's
review of a decision by the Commissioner is whether the Commis-
sioner applied the correct legal principles in her determination.
Tejada v. Apfel, supra, 167 F.3d at 773; Johnson v. Bowen, supra,
817 F.2d at 985; Ellington v. Astrue, supra, 641 F. Supp. 2d at
327-28; Santiago v. Barnhart, supra, 441 F. Supp. 2d at 625.  As
noted in Section III.A.4, the ALJ has an affirmative obligation
to develop the administrative record, whether or not the plain-
tiff was represented by counsel at the hearing.  See Halloran v.
Barnhart, supra, 362 F.3d at 31; Shaw v. Chater, supra, 221 F.3d
at 131; Rosa v. Callahan, supra, 168 F.3d at 79; Tejada v. Apfel,
supra, 167 F.3d at 774; Pratts v. Chater, supra, 94 F.3d at 37;

---

[67]The ALJ also noted that "[b]ased on the application for
[SSI] filed on June 25, 1992, [plaintiff] has been disabled under
section 1614(a)(3)(A) of the [SSA] beginning on July 11, 1990,
through June 24, 1992, the end of the Stieberger period" (Tr.
177).  She further indicated that plaintiff would be contacted by
SSA regarding the payment of these benefits.  She again noted
that plaintiff was already receiving SSI at the time (Tr. 177).

Echevarria v. Sec'y of Health & Human Servs., supra, 685 F.2d at 755.  The ALJ has a "heightened duty" to develop the record when, as here, the claimant appears pro se.  See Echevarria v. Sec'y of Health & Human Servs., supra, 685 F.2d at 755; see also Bucci v. Apfel, 98 Civ. 2372 (RWS), 1999 WL 553787 at *5 n.5 (S.D.N.Y. July 29, 1999) (Sweet, D.J.); Cruz v. Sullivan, 912 F.2d 8, 11 (2d Cir. 1990).

"'Where there are gaps in the administrative record or the ALJ has applied an improper legal standard,'" a remand to the Commissioner for further development of the evidence and proper application of the correct legal standards is required.  La Patra v. Barnhart, 402 F. Supp. 2d 429, 431 (W.D.N.Y. 2005), citing Pratts v. Chater, supra, 94 F.3d at 39, quoting Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); see also Rosa v. Callahan, supra, 168 F.3d at 83.  "A case seeking judicial review of the Commissioner's adverse decision may be remanded pursuant only to sentence four or six of § 405(g)."  Hunter v. Astrue, No. 4:10cv-0161 TCM, 2010 WL 2880176 at *1 (E.D.Mo. July 19, 2010), citing Shalala v. Schaefer, 509 U.S. 292, 296 (1993) and Melkonyan v. Sullivan, 501 U.S. 89, 97-98 (1991).

Plaintiff claimed that she was treated by several doctors for her ailments.  She stated that Dr. Lavala[68] treated her for asthma, a heart condition, allergies, anemia, varicose veins, high blood pressure and diabetes (Tr. 93, 101, 109).  She also claimed that Dr. Sun H. Lee and Dr. Rublin treated her for asthma, bronchitis, a heart condition and diabetes[69] (Tr. 34, 93, 109, 157).  Plaintiff further alleged that she was treated for these same ailments by Dr. Carmen Fernandez for some period beginning on or about April 1988 (Tr. 109).  However, the Commissioner had only described and provided evidence of attempts to obtain information from St. Vincent's Hospital, Dr. Hobacon and Dr. McVeigh, whom plaintiff also claimed had treated her (Tr. 18-19, 36, 99, 117, 175, 243-51).

Because the record did not appear to include any medical records from these other four treating physicians, I directed counsel for the Commissioner to advise me if there is any documentation from Drs. Lavala, Savales, Zavalla, Lee, Rublin and Fernandez in the record, or any explanation in the record for

---

[68]Plaintiff reported treatment by Drs. Lavala, Savales and Zavalla (Tr. 93, 101, 109).  There is some discrepancy concerning her dates of treatment, but plaintiff consistently alleged some treatment during the relevant time period.

[69]Again, there is some discrepancy as to the dates of treatment, but plaintiff did allege some treatment during the relevant time period (Tr. 34, 93, 109, 157).

the failure to obtain documentation from these physicians (Docket Item 17).  I received a letter from the Commissioner on July 22, 2011 stating that counsel could not locate any evidence that Dr. Lavala was contacted.  In addition, the July 22, 2011 letter and attached Case Development Summary from the New York State Department of Social Services indicated that the Commissioner did attempt to contact Dr. Zavalla one time, but received no response.  The Commissioner also contacted Drs. Lee and Fernandez, but they did not have any evidence relevant to the adjudicative period.  Finally, the Commissioner noted that plaintiff had indicated on October 27, 1999 that Drs. Lee, Rublin and Savales were no longer in practice (Tr. 93, 101).  The Commissioner did not claim to have attempted contact with the latter two doctors at all.

The Commissioner must make "every reasonable effort to help [a claimant] get medical reports from [claimant's] own medical sources when [the claimant] give[s the agency] permission to request the reports."  20 C.F.R. § 404.1512(d).  "Every reasonable effort" is defined to mean that the Commissioner

> will make an initial request for evidence from your medical source and, at any time between 10 and 20 calendar days after the initial request, if the evidence has not been received, we will make one followup request to obtain the medical evidence necessary to make a determination.  The medical source will have a minimum of 10 calendar days from the date of our

      followup request to reply, unless our experience with
      that source indicates that a longer period is advisable
      in a particular case.

20 C.F.R. § 404.1512(d)(1).

    In this case, the Commissioner failed to make every
reasonable effort to contact plaintiff's treating physicians.
The Commissioner has not offered any reason for not contacting
Dr. Lavala, and it appears that he did not attempt to contact
Drs. Rublin and Savales because plaintiff reported that they were
no longer in practice.  The parties have not briefed this issue,
and my own research has disclosed only a limited number of
decisions addressing this situation.  However, the relevant legal
authority that I have found uniformly indicates that the Commis-
sioner should have attempted to contact plaintiff's treating
physicians even if they were no longer in practice.  For example,
in <u>Deinlein v. Commissioner of Social Security</u>, No. CV-10-118-HU,
2011 WL 2358115 at *6 (D. Or. May 6, 2011) (Report & Recommenda-
tion), <u>adopted</u> <u>at</u>, 2011 WL 2441721 (D. Or. 2011), a claimant had
listed a retired doctor as a treating physician in her disability
report and asked the agency to obtain her medical records, but
there was nothing in the record indicating that the ALJ or any
other individual had attempted to do so.  The court found that
the ALJ failed to develop the record in this regard, partially
relying on the fact that the claimant had asked for assistance

and was mentally ill.  Deinlein v. Commissioner of Social Security, supra, 2011 WL 2358115 at *14.  While this case is factually distinguishable because plaintiff here is not mentally ill and did not specifically request assistance in getting these records, it is instructive in demonstrating that the mere fact that the doctor was retired did not relieve the ALJ from his obligation to attempt to obtain the claimant's records.  Similarly, in Schmelzle v. Astrue, No. 6:07-CV-931 (NAM), 2010 WL 3522305 at *4 n.2 (N.D.N.Y. Sept. 1, 2010), the court noted that the ALJ discharged his obligation to develop the record with respect to a doctor who had retired when he asked plaintiff's attorney about the physician and the attorney reported that he had attempted to obtain this doctor's records, to no avail. Again, this case does not specifically address the Commissioner's obligation to obtain records from a physician whom he believes to be retired, but it indicates that an attempt to obtain records from retired or inactive physicians is required to discharge properly the ALJ's obligation to develop the record.

Accordingly, I conclude that the ALJ should have attempted to contact all of plaintiff's treating physicians, even those whom plaintiff believed were no longer in practice.  By failing to do so, the Commissioner did not properly discharge his legal obligation to develop the record.

2.  Substantial Evidence

Because I find legal error requiring remand, I need not consider whether the ALJ's decision was otherwise supported by substantial evidence.  See Johnson v. Bowen, supra, 817 F.2d at 986; Ellington v. Astrue, supra, 641 F. Supp. 2d at 328.

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respect-fully recommend that the case be remanded to the Commissioner for further administrative proceedings consistent with this Report and Recommendation.

V.  Objections

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from the date of this Report to file written objections.  See also Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Lewis A. Kaplan, United States District Judge, 500 Pearl Street, Room 1310, New York, New York 10007, and to the chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York

10007.  Any requests for an extension of time for filing objec-

tions must be directed to Judge Kaplan.  FAILURE TO OBJECT WITHIN

FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL**

PRECLUDE APPELLATE REVIEW.  Thomas v. Arn, 474 U.S. 140 (1985);

United States v. Male Juvenile, 121 F.3d 34, 38 (2d Cir. 1997);

IUE AFL-CIO Pension Fund v. Herrmann, 9 F.3d 1049, 1054

(2d Cir. 1993); Frank v. Johnson, 968 F.2d 298, 300 (2d Cir.

1992); Wesolek v. Canadair Ltd., 838 F.2d 55, 57-59 (2d Cir.

1988); McCarthy v. Manson, 714 F.2d 234, 237-38 (2d Cir. 1983).


Dated:  New York, New York
        August 8, 2011

                              Respectfully submitted,


                              HENRY PITMAN
                              United States Magistrate Judge


Copies mailed to:

Ms. Sabina Vargas
Apt. 3-D
117 9th Avenue
New York, New York 10011

Jason Peck, Esq.
Special Assistant United States Attorney
Southern District of New York
3rd Floor
86 Chambers Street
New York, New York 10007